UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JASON D. GEIGER,

                    Plaintiff,

          -against-                                        1:13-CV-0938 (LEK)

CAROLYN W. COLVIN,
Commissioner Of Social Security,

                    Defendant.

_____

## MEMORANDUM-DECISION and ORDER

## I.    INTRODUCTION

       This case has proceeded in accordance with General Order 18, which set forth the

procedures to be followed in appealing a denial of Social Security benefits.  Both Parties have filed

briefs.  Dkt. Nos. 10 ("Plaintiff's Brief"); 12 ("Defendant's Brief").  For the following reasons, the

judgment of the Social Security Administration ("SSA") is affirmed.

## II.   BACKGROUND

### A.  Plaintiff's Medical Records

       Plaintiff Jason D. Geiger ("Plaintiff") began experiencing developmental delays at a young

age, including delays in speech, an obsession with vulgar language, and anger issues.  Dkt. No. 8

("Record") at 163-64.  Despite Plaintiff's early signs of aggression, his aggression towards people

was rare.  R. at 164.  Plaintiff's developmental delays led to an initiation of services at the age of

two and a half, which included psychotherapy, extra help at school, and eventually placement into

Mountain Lake Academy, a special children's residence.  R. at 163, 169, 190, 193.

       Plaintiff has received numerous psychological evaluations throughout his lifetime.  At age

six, Plaintiff was diagnosed by Dr. Virginia Khoury with an Adjustment Disorder and by Dr. Zvi

Klopott with an Intermittent Explosive Disorder. R. at 164. Two years later, at the age of eight and

a half, Plaintiff was diagnosed by Developmental Pediatrician Dr. Deborah Kriss with Tourette's

Syndrome, Obsessive-Compulsive Disorder, and Attention Deficit Disorder. Id.

On September 16, 2005, Plaintiff was examined By Dr. Ruth Dowling Bruun ("Dr. Bruun"),

who noted that Plaintiff "presented as much more mature and socially connected than he had on any

previous occasion." R. at 177. Dr. Bruun also noted that Plaintiff's "diagnoses have not changed

although the way they are manifested has differed as he has matured." Id. According to Dr. Bruun,

Plaintiff's biggest issues at the time were impulse control and poor social judgment. Id. Both Dr.

Passen and Dr. Bruun recommended family therapy sessions. R. at 164, 177.

In 2005, Plaintiff was also examined by Neuropsychologist Dr. Herman Davidovicz ("Dr.

Davidovicz"). R. at 167-71. Dr. Davidovicz found that the Plaintiff scored in the 61st percentile

with a total score of 104 on the Wechsler Adult Intelligence Scale-Third Edition (WAIS-III). R. at

168. However, Plaintiff's results did contain a significant discrepancy between his verbal and non-

verbal scores, the latter falling in the 27th percentile. Id. Plaintiff exhibited the greatest difficulty

with tasks that required speed. Id. After conducting various examinations on June 27-28th and July

25th, Dr. Davidovicz prescribed that the Plaintiff receive extra time on all tasks, that all notes be

supplied to him, and that his writing assignments be graded on content rather than spelling and

grammar. R. at 170.

On March 7, 2006, Plaintiff was evaluated by a psychiatrist, Dr. David Hedden ("Dr.

Hedden"), who noted Plaintiff's "long-standing diagnoses of Tourette's, Obsessive-Compulsive

Disorder, Attention Deficit Hyperactivity Disorder and Bipolar Disorder." R. at 191. Dr. Hedden

concluded that Plaintiff's "treatment programs in school and for medication management have been complicated by significant differences of opinion between his parents." R. at 191. Dr. Hedden noted that the dysfunction in Plaintiff's family "has also probably complicated Plaintiff's interpersonal development and functioning." Id. Past recommendations from doctors had included family therapy in order to help Plaintiff's parents find common ground regarding his conditions and treatments. See R. at 165, 170, 178, 183. Plaintiff's parents are divorced, and he spent half his time with each parent. R. at 165. This living arrangement also affected Plaintiff's treatment as mixed reports from the parents were common and it was difficult for doctors to discern what behavior should be attributed to his disorders and what behavioral problems could be treated with an improvement in family cohesion. R. at 163, 165. A lack of established rules across the two households prevented Plaintiff from having a cohesive understanding of acceptable behavior. R. at 165. According to Dr. Hedden, Plaintiff's split living arrangement undermined his treatment program. R. at 190.

In March 2006, Plaintiff was admitted to the Brookview Unit at Mountain Lake Children's Residence ("Brookview"), where he was monitored and evaluated by doctors. R. at 185-91. While there, Dr. Hedden noted that Plaintiff "appears to be a healthy, but obese adolescent Caucasian male." R. at 190. He also noted that Plaintiff appeared "mildly anxious in the meeting, but he did not show any nervous signs." Id. Dr. Hedden also noted that Plaintiff was easily distracted and "digressed and gave unnecessary detailed information, but could easily be refocused." Id. The doctor did not notice any evidence of depression, although Plaintiff admitted to making suicidal gestures without actually intending to hurt or kill himself. Id. In a follow-up meeting with Plaintiff on October 17, 2006, Dr. Hedden noted that Plaintiff "ha[d] done well this month," that he had been

"attending school and getting work done," and that he had received passing scores for behavioral

performance in school and had made "good progress" academically.  R. at 192.

Psychiatrist Dr. Timothy Landis ("Dr. Landis") treated Plaintiff from 2003 through 2006,

and began treating him again on November 9, 2007.  R. at 333-34.  At the November 9, 2007

appointment, Dr. Landis described Plaintiff as a "neatly groomed, pleasant and cooperative 18-year-

old male."  Id.  Dr. Landis also noted "some verbal impulsivity and argumentativeness" and

confirmed Plaintiff's earlier diagnoses.  R. at 333-34.  He recommended, *inter alia*, that Plaintiff

continue his medications and undergo psychotherapy and possibly group social skills psychotherapy.

R. at 334.  He also discussed with Plaintiff "supportive interventions for education and work."  Id.

Dr. Landis continued to treat Plaintiff periodically through February 2012.  See R. at 228, 255, 336,

437.  Though Dr. Landis noted some improvement in Plaintiff's mood in early 2011, see R. at 41, in

April 2011, Dr. Landis wrote a letter to the SSA opining that Plaintiff was "unable to hold even

part-time jobs for significant periods of time" due to "impaired social judgment, poor impulse

control and mood instability," and that Plaintiff's "disorganization, poor time management and poor

judgment result in struggling to keep up with a single college-level course," R. at 255.  In May

2011, Dr. Landis again noted improvement in Plaintiff's mood and affect.  R. at 440.  However, in

July 2011, Dr. Landis noted that though Plaintiff's mood had improved, he still experienced verbal

impulsivity.  R. at 429.

In treatment notes from February 8, 2012, Dr. Landis noted that Plaintiff was taking three

college courses, making more mature decisions, and possibly working part-time as a cashier at

Home Depot.  R. at 438.  Dr. Landis noted that Plaintiff still experienced anxiety attacks in

anticipation of difficult exams or work and still displayed impaired social judgment, but that

Plaintiff's insight and judgment had improved and that he was "[m]ore willing to ask for help in an appropriate fashion." Id. Finally, he noted that Plaintiff "still significantly lagg[ed] his peers due to the Pervasive Developmental Disorder." Id.

In February 2012, Dr. Landis completed a Residual Functional Capacity Questionnaire on behalf of Plaintiff. R. at 443. Dr. Landis indicated that he saw Plaintiff every three months to renew his medication. Id. Dr. Landis noted clinical findings of extremely poor social skills and interpersonal boundaries. Id. He identified Plaintiff's symptoms as: impairment in impulse control; mood disturbances; difficulty thinking or concentrating; emotional liability; and deeply ingrained, maladaptive patterns of behavior. R. at 444. Dr. Landis opined that Plaintiff's abilities were limited but satisfactory in the following areas: understand, remember, and carry out short and simple instructions; make simple work-related decisions; perform at a consistent pace without an unreasonable number and length of rest periods; ask simple questions or request assistance; respond appropriately to changes in a routine work setting; deal with normal work stress; be aware of normal hazards and take appropriate precautions; set realistic goals; deal with stress of semiskilled and skilled work; adhere to basic standards of neatness and cleanliness; travel in unfamiliar places; and use public transportation. R. at 445-46. Dr. Landis indicated that Plaintiff was seriously limited in his ability to: remember work-like procedures; maintain regular attendance and be punctual; sustain an ordinary routine without special supervision; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; understand, remember, and carry out detailed instructions; interact appropriately with the general public; and maintain socially appropriate behavior. Id. Finally, Dr. Landis opined that Plaintiff was unable to meet competitive standards in the following areas:

maintain attention for two-hour segment; work in coordination with or proximity to others without being unduly distracted; and complete a normal workday and workweek without interruptions from psychologically based symptoms. R. at 445. He concluded that Plaintiff could not engage in full-time competitive employment on a sustained basis. R. at 447.

Prior to Dr. Landis's assessment, reviewing psychologist Dr. H. Ferrin ("Dr. Ferrin") and Medical Consultant Dr. L. Hoffman ("Dr. Hoffman") had completed Functional Capacity Assessments for Plaintiff in August 2010 and April 2011, respectively, and noted only mild to moderate limitations in these areas. R. at 407-09. In his assessment, Dr. Hoffman concluded that Plaintiff "retains the capacity to understand and follow simple directions, maintain concentration to complete simple tasks, and can adhere to a regular schedule." R. at 278. Due to Plaintiff's difficulties socializing with others, Dr. Hoffman recommended a low-contact setting. Id.

On April 7, 2011 Plaintiff was examined by a psychologist, Dr. Kerry Brand ("Dr. Brand") for a consultive examination. R. at 256-60. At this examination, Plaintiff reported ongoing episodes of depression that could last anywhere from one day to a week. R. at 257. Plaintiff also described symptoms of mania and reported experiencing mood swings and difficulty controlling his temper. Id. Plaintiff told Dr. Brand that he no longer experienced any symptoms of Obsessive-Compulsive Disorder or a formal thought disorder, both problems for him in the past. Id. Dr. Brand noted that Plaintiff has a "coherent and goal directed" thought process and his attention and concentration was "intact." Id. However, she also noted that he "has ongoing problems with distractability, disorganization, problems finishing what he starts, and sustaining attention." Id. His recent and remote memory skills were described as "mildly impaired" with Plaintiff being able to recall three of three objects immediately, but only two digits after five minutes. R. at 259. His

cognitive function was evaluated as being in the "average range." Id. Dr. Brand also noted that Plaintiff could "follow and understand simple directions and instructions and perform simple tasks with supervision," but that "he may have moderate difficulty maintaining attention and concentration and maintaining a regular schedule." R. at 259. Dr. Brand concluded that the results of the evaluation were consistent with some psychiatric problems, which "may significantly interfere with the Plaintiff's ability to function on a daily basis." Id. Dr. Brand recommended that Plaintiff continue with psychiatric treatment as he had been doing and that he could benefit from some counseling. R. at 260. With proper support, Dr. Brand stated her belief that Plaintiff "will find symptom relief and maximize his abilities." Id.

On July 14, 2011, Plaintiff was examined by psychologist Dr. Annette Payne ("Dr. Payne"). R. at 325. Dr. Payne reported that Plaintiff's social skills were fair, but that his mood and affect appeared agitated. R. at 326. She noted that his attention and concentration, as well as recent and remote memory skills were impaired—Plaintiff was able to complete simple calculations, but not more difficult calculations, for example—and that his cognitive functioning was average. R. at 328. Dr. Payne noted that Plaintiff had mild to moderate difficulties relating to others and that "[h]is reports appear consistent with his presentation." Id. She concluded that Plaintiff would benefit from counseling and medications, and that "[h]e would probably benefit from vocational rehabilitation."

Plaintiff has taken numerous medications for his condition. R. at 167, 175. Due to conflicting reports from Plaintiff's parents, teachers, and therapists, Plaintiff has not had a consistent combination of medications over a long period. R. at 175. Most recently, Plaintiff took Lamictal for his depression and Xanax on an as-needed basis for his anxiety. R. at 34. The

Lamictal was prescribed by Dr. Landis on July 20, 2011 and the Xanax on February 8, 2012. R. at 438.

**B. ALJ Hearing**

On February 8, 2011, Plaintiff filed an application for supplemental security income alleging disability beginning August 24, 1988. R. at 11. The claim was denied on April 25, 2011 because the SSA concluded that Plaintiff's conditions were not severe enough to keep him from working. R. at 50. Plaintiff then filed a request to appear before an Administrative Law Judge ("ALJ") on May 20, 2011. R. at 11. Plaintiff appeared and testified at a hearing on April 4, 2012, in Albany, New York. Id.

At the hearing, ALJ Arthur Patane questioned Plaintiff with respect to his current medical state, employment history, and daily activities. R. at 25-43. Plaintiff testified that he was enrolled in three courses at Hudson Valley Community College, but was not able to maintain a full course load. R. at 28, 33. At the time of the hearing, Plaintiff also held a part-time job at Wal-Mart that he had started three and a half weeks prior to the hearing. R. at 28. Plaintiff was hired to work in the back room where he would stock shelves, but because he performed too slowly, he was moved to a new position. Id. Plaintiff explained that he has trouble focusing and staying organized. R. at 31. He further testified that his mind "wanders off a lot" and that he cannot focus for more than forty-five minutes at a time. R. at 31, 39.

Plaintiff's attorney then questioned Plaintiff about his educational history. R. at 32. Plaintiff testified that he transferred schools a few times because he could not handle being in a regular school. R. at 41. In class, Plaintiff had difficulties paying attention and was disruptive. R. at 32. In college, Plaintiff is registered with the Disability Resource Center and receives extra time

on exams and assignments and notes are provided to him.  R. at 29.  Plaintiff testified that he drives

himself to class, but stated, "it took me a while to get my license" due to difficulties in learning how

to drive.  Id.  Plaintiff also stated that due to his depression he is sometimes unable to attend class

and does not leave his bed for a day at a time once or twice a week.  R. at 37.  Plaintiff also stated

that he has had full-time aids all throughout high school and that he has trouble understanding what

he is reading and is forced to read the material multiple times.  Id.  He also explained that he has

difficulty paying attention in class.  Id.  Plaintiff admitted to having difficulty staying on track in

college and explained that he cannot handle more than two courses at a time.  R. at 33.  Plaintiff

stated that he has similar difficulties at work as at school.  R. at 34.  For example, using the cash

register is difficult for him, as he is required to remember many different functions and work

quickly.  Id.

Plaintiff also described his social life and living arrangements.  R. at 30.  Plaintiff testified

that he visits his extended family for holidays and he has "a few friends that sometimes they come

over."  Id.  Plaintiff enjoys watching movies, listening to music, and doing other similar activities in

his spare time.  R. at 31.  Plaintiff admitted to having problems with his co-workers.  R. at 35.  He

testified that "a lot of times they don't talk to me" and that he has trouble getting along with people.

Id.  Plaintiff stated that he sometimes gets into arguments with his mother, but they are solely

verbal, not physical.  Id.

Plaintiff currently sees a psychiatrist once a month who prescribes him medication.  R. at 30.

Plaintiff admitted that he has been seeing this psychiatrist "for a very long time," since before high

school.  Id.  Following a question regarding Plaintiff's medication, he testified that he has tried

many different medications, but they "interfere with other problems that I have."  R. at 39.  Plaintiff

stated that he is currently taking Xanax for his anxiety and Lamictal for his depression.  R. at 34, 39.  Plaintiff claims that he experiences anxiety a couple times per week when he cannot handle his course load at community college.  See R. at 37.

### C.  Procedural History

The ALJ issued a decision denying Plaintiff's application on April 13, 2012.  R. at 8.  The ALJ followed the five-step sequential evaluation process established by the SSA for determining whether an individual is disabled.  R. at 11-13.  The ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date, February 8, 2011.  R. at 13.  The ALJ determined that while Plaintiff has a combination of severe impairments—ADHD, Tourette's syndrome, obsessive compulsive disorder, and bipolar disorder—Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix I.  Id.  The ALJ considered listings 12.02, 12.04, 12.06, 12.10 and all relevant listings in light of the evidence.  Id.

The ALJ found that Plaintiff had the residual functional capacity ("RFC") "to perform a full range of work at all exertional levels," but "is limited to following, understanding, and carrying out simple instructions, and is in a low-contact setting."  R. at 14.   Finally, the ALJ determined that Plaintiff had no past relevant work, but that "there are jobs that exist in a significant numbers in the national economy that [Plaintiff] can perform."  R. at 18.  The ALJ therefore concluded that Plaintiff was not disabled under the Social Security Act.  Id.

Plaintiff filed a review request on June 8, 2012.  R. at 7.  On June 19, 2013, the ALJ decision became the final decision of the Commissioner when the Appeals Council denied the request for review.  R. at 1.  Plaintiff filed a timely appeal on August 8, 2013.  Dkt. No. 1 ("Complaint").

### III. LEGAL STANDARD

#### A. Standard of Review

When a court reviews an SSA's final decision, it determines whether the ALJ applied the correct legal standards and whether the decision is supported by substantial evidence in the record. 42 U.S.C. § 405(g); Roat v. Barnhart, 717 F. Supp. 2d 241, 248 (N.D.N.Y. 2010) (Kahn, J.) (citing Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982)). Substantial evidence amounts to "more than a mere scintilla," and it must reasonably support the decision-maker's conclusion. Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). The Court defers to the Commissioner's decision if it is supported by substantial evidence, "even if it might justifiably have reached a different result upon a de novo review." Sixberry v. Colvin, No. 12-CV-1231, 2013 WL 5310209, at *3 (N.D.N.Y. Sept. 20, 2013) (quoting Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)). However, the Court should not uphold the ALJ's decision when there is substantial evidence, but it is not clear that the ALJ applied the correct legal standards. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

#### B. Standard for Benefits

According to SSA regulations, disability is "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). An individual seeking disability benefits "need not be completely helpless or unable to function." De Leon v. Sec'y of Health & Human Servs., 734 F.2d 930, 935 (2d Cir. 1984) (quoting Gold v. Sec'y of Health, Educ. & Welfare, 463 F.2d 38, 41 n.6 (2d Cir. 1972)). In order to receive disability benefits, a claimant must satisfy the

requirements set forth in the SSA's five-step sequential evaluation process. 20 C.F.R. § 404.1520(a)(1). In the first four steps, the claimant bears the burden of proof; at step five, the burden shifts to the SSA. Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (quoting Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996)). If the SSA is able to determine that the claimant is disabled or not disabled at any step, the evaluation ends. 20 C.F.R. § 404.1520(a)(4). Otherwise, the SSA will proceed to the next step. Id.

At step one, the SSA considers the claimant's current work activity to see if it amounts to "substantial gainful activity." Id. § 404.1520(a)(4)(i). If it does, the claimant is not disabled under SSA standards. Id. At step two, the SSA considers whether the claimant has a severe medically determinable physical or mental impairment, or combination of impairments that is severe, that meets the duration requirement in 20 C.F.R. § 404.1509. Id. § 404.1520(a)(4)(ii). If he or she does not have such an impairment, the claimant is not disabled under SSA standards. Id. At step three, the SSA considers the severity of the claimant's medically determinable physical or mental impairment(s) to see if it meets or equals an impairment and the requisite duration listed in 20 C.F.R. § 404(P), Appendix I. Id. § 404.1520(a)(4)(iii). If it does not, the SSA moves on to step four to review the claimant's RFC and past relevant work. Id. § 404.1520(a)(4)(iv). The claimant is not disabled under SSA standards if the RFC reveals that the claimant can perform past relevant work. Id. If the claimant cannot perform his past relevant work, the SSA decides at step five whether adjustments can be made to allow the claimant to work somewhere in a different capacity. Id. § 404.1520(a)(4)(iv). If appropriate work does not exist, then the SSA considers the claimant to be disabled. Id.

## IV.  DISCUSSION

Plaintiff argues that the ALJ erred by: (1) affording inadequate weight to the opinion of his treating physician, Dr. Landis; (2) failing to properly assess Plaintiff's credibility; and (3) failing to keep the record open for additional evidence.  Pl.'s Br. at 1.

### A.  Treating Physician Rule

Under the "treating physician rule," the opinion of a treating physician is given controlling weight where it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence."  20 C.F.R. § 404.1527(c)(2); see also Halloran, 362 F.3d at 31.  However, a treating physician's opinion need not be given controlling weight where it is contradicted by other substantial evidence in the record.  Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002).  "[T]he less consistent [an opinion] is with the record as a whole, the less weight it will be given."  Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999).  When an ALJ does not give controlling weight to a treating physician's opinion, then the ALJ must consider the following factors in determining the appropriate weight to assign to the opinion:

> (i) the length of the treatment relationship and the frequency of examination; (ii) the nature and extent of the treatment relationship; (iii) the extent to which the opinion is supported by relevant evidence; (iv) the consistency of the opinion with the record as a whole; (v) specialization; and (vi) other factors.

20 C.F.R. § 404.1527(c)(2).  An ALJ is required to explain the weight given to the opinion of a treating physician and must give "good reasons."  Snell, 177 F.3d at 133.

Plaintiff argues that the ALJ erred in assigning "little weight" to the opinion of Plaintiff's treating physician, Dr. Landis.  Pl.'s Br. at 3-8.  Dr. Landis evaluated Plaintiff as seriously limited in his ability to: remember work-like procedures; maintain regular attendance and be punctual; sustain

an ordinary routine without special supervision; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; understand, remember, and carry out detailed instructions; interact appropriately with the general public; and maintain socially appropriate behavior. R. at 445-46. Dr. Landis opined that Plaintiff was unable to meet competitive standards in the following areas: maintain attention for two-hour segment; work in coordination with or proximity to others without being unduly distracted; and complete a normal workday and workweek without interruptions from psychologically based symptoms. R. at 445. Dr. Landis concluded that Plaintiff was unable to perform full- or even part-time work for a significant period of time. R. at 255, 447. The ALJ determined the Dr. Landis' conclusions regarding the nature and severity of Plaintiff's limitations, and his opinion regarding Plaintiff's capacity for work were contradicted by the record as a whole. R. at 15. The ALJ further determined that Dr. Landis' own examination records undermined his assessment. Id. Plaintiff asserts that Dr. Landis' opinion was not (1) contradicted by the record as a whole and (2) inconsistent with his own examination notes. Pl.'s Br. at 5-8. The Court disagrees, and finds that the ALJ properly assigned Dr. Landis' opinion little weight.

The ALJ found substantial evidence in the record that contradicted Dr. Landis' opinion. R. at 16-17. The ALJ observed that evaluations by Drs. Payne, Brand, Ferrin, and Hoffman all contradicted Dr. Landis' assessment that Plaintiff could not perform even part-time work on a consistent basis. R. at 16-17; see also R. at 256-60, 276-79, 327-28, 407-09. Drs. Ferrin, Payne, and Hoffman all evaluated Plaintiff and opined that he does exhibit "mild restrictions" and "moderate difficulties," but concluded that Plaintiff is able to follow and understand simple instructions and perform simple tasks with supervision. R. at 16-17. Although Dr. Brand's report

was slightly less optimistic than that of the other doctors—stating that the claimant may experience "moderate to severe" difficulties in maintaining attention and concentration, maintaining a regular schedule, learning new tasks, and performing complex tasks independently—the ALJ found that his overall assessment was consistent with the reports of Drs. Ferrin and Payne. R. at 17. The ALJ further pointed out that Dr. Landis' evaluations of Plaintiff were far more severe than Plaintiff's actual work activity and activities of daily life. R. at 16. Indeed, Plaintiff stated at the hearing that he was taking courses at community college and working part-time at Wal-Mart, and is able to adequately complete daily activities, such as housework, cooking, swimming, and driving. Id. Finally, the ALJ observed that Dr. Landis' own examination notes indicated that Plaintiff reported improved symptoms. R. at 15-16.

Plaintiff contends that the ALJ erred in finding that the evaluations of Drs. Ferrin, Payne, Brand, and Hoffman were contradictory to Dr. Landis' opinion. Pl.'s Br. at 7-8. Plaintiff points out that Drs. Ferrin, Payne, Brand, and Hoffman all recognized Plaintiff has impairments limiting his ability to work, and only differed from Dr. Landis in their evaluations of Plaintiff as to the severity of his impairment. Id. at 7. Plaintiff argues that a difference of opinion as to the degree of severity of an impairment alone does not constitute substantial evidence which supports assigning a treating physician's opinion less than controlling weight. Id. (citing Rustico v. Astrue, No. 05 CV 349, 2008 WL 2622926, at *8-9 (E.D.N.Y. July 1, 2008)). However, the ALJ considered the record as a whole and determined that it was consistent with the opinions of Drs. Ferrin, Payne, Brand, and Hoffman, and was inconsistent with the opinion of Dr. Landis. R. at 16. Drs. Ferrin, Payne, Brand, and Hoffman all concluded that Plaintiff's work-related impairments were less severe than Dr. Landis found them to be. See Snell, 177 F.3d at 133 (finding that the opinions of "treating physicians are . .

15

. inconsistent with the other substantial evidence" where "[t]he record contain[ed] evidence from several other doctors who examined [plaintiff] and made less favorable findings.").

Plaintiff further contends that the ALJ erred in finding that Dr. Landis' own examination notes undermined his opinion. Pl.'s Br. at 5-6. Plaintiff argues that treatment notes referred to by the ALJ are not inconsistent with Dr. Landis' conclusion. Id. However, the Court finds this argument without merit; the cited notes indicating Plaintiff's improved symptoms are in fact contrary evidence to Dr. Landis' opinion. The ALJ must give controlling weight to a treating physician's opinion only where it "is not inconsistent with other substantial evidence" in the record. 20 C.F.R. § 416.927(c)(2). The ALJ properly found that the cited notes were inconsistent with Dr. Landis' opinion regarding the level of Plaintiff's impairments.

Finally, Plaintiff argues that the ALJ erred in failing to further develop the record "to determine upon what information [Dr. Landis] was basing his opinions." Pl.'s Br. at 8 (citing Colegrove v. Comm'r of Soc. Sec., 399 F. Supp. 2d 185, 196 (W.D.N.Y. 2005)). However, the ALJ did not give less weight to Dr. Landis' opinion because there were gaps in the record or because he could not determine the evidence on which Dr. Landis's opinion was based, but rather because it was contradicted by substantial evidence in the record. "[W]here there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." Miller v. Comm'r of Soc. Sec., 409 F. App'x 384, 387 (2d Cir. 2010). Therefore, the ALJ did not err in not developing the record further.

Accordingly, the Court finds that the ALJ properly afforded limited weight to the opinion of Dr. Landis and gave great weight to the opinions of Drs. Ferrin, Payne, Brand, and Hoffman.

16

## B. Credibility Determination

An ALJ is not required to accept a claimant's subjective complaints without inquiry. Rockwood v. Astrue, 614 F. Supp. 2d 252, 270 (N.D.N.Y. 2009). However, when rejecting a claimant's subjective complaints for lack of credibility, the ALJ "must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his determination is based on substantial evidence." Martone v. Apfel, 70 F. Supp. 2d 145, 152 (N.D.N.Y. 1999) (quoting Brandon v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987)). Furthermore, "whatever findings the ALJ makes must be consistent with the medical and other evidence." Williams ex rel. Williams v. Bowen, 859 F.2d 255, 261 (2d Cir. 1988). If, however, the record supports contrary findings, a court will give the ALJ's factual findings conclusive weight so long as they are supported by substantial evidence. Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010).

An ALJ must follow a two-part inquiry in assessing the credibility of a claimants' symptoms of pain:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or medical impairment(s) . . . that could reasonably be expected to produce the individual's pain or other symptoms. . . .
>
> Second . . . the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities.

SSR 96-7p . Because "symptoms sometimes suggest a greater severity of impairment than can be shown by objective evidence alone, [an ALJ] will carefully consider any other information," including the following factors:

(i) [The claimant's] daily activities;

(ii) The location, duration, frequency, and intensity of pain or other symptoms;
(iii) Precipitating and aggravating factors;
(iv) The type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms;
(v) Treatment, other than medication, received for relief of pain or other symptoms;
(iv) Any measures used to relieve pain or other symptoms; and
(vii) Other factors concerning functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3)(i)-(vii); 416.929(c)(3)(i)-(vii).

Plaintiff argues that the ALJ applied the incorrect legal standard in making his credibility determination. Pl.'s Br. at 9-11. Specifically, Plaintiff argues that the ALJ improperly combined the credibility and RFC analysis because he determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects of those symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." Id. at 10-11 (quoting R. at 15).

Contrary to Plaintiff's argument, the ALJ properly evaluated the factors listed above in determining Plaintiff's credibility. The ALJ considered Plaintiff's reports of his daily activities and concluded that "the record reveals that [Plaintiff] is able to adequately maintain his activities of daily living," which included, *inter alia*, cooking, dressing himself, doing laundry, and socializing with friends and family. R. at 16. The ALJ further noted that Plaintiff reported working part time (twenty to thirty hours per week) as a stocker at Wal-Mart in addition to taking two college courses per semester. Id. Plaintiff testified that prior to working at Wal-Mart he had a part time job at Target from November 2011 to December 2011 that he left because it was a seasonal job, not due to his impairments. Id. The ALJ also took into account reports made by the Plaintiff to Dr. Landis in May 2011 and February 2012. R. at 15. In May 2011, Plaintiff reported doing better and greater

mood stability with his new medication (Lamictal).  Id.  Additionally, the ALJ noted that Plaintiff

reported to Dr. Landis that he was not experiencing any side effects from his medication.  Id.  In

February 2012, Plaintiff pointed out to Dr. Landis that he arrived to his appointment on time and

that he was "making more mature decisions."  R. at 16.   Finally, the ALJ noted that Plaintiff's

symptoms increased with stressful life events, such as taking college examinations.  R. at 16.

Therefore, the ALJ appropriately evaluated all of the factors in 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii)

and 416.929(c)(3)(i)-(vii) in finding that Plaintiff's "statements concerning the intensity, persistence

and limiting effects of those symptoms are not credible."

### C. Keeping the Record Open

Plaintiff also claims that the ALJ erred by failing to keep the record open for additional

evidence from the Community College that Plaintiff was attending at the time.  Pl.'s Br. at  9.  The

ALJ, however, did not have an obligation to obtain Plaintiff's college transcripts before rendering

his decision.  20 C.F.R. § 404.1512(d) (providing that the Commissioner will complete a claimant's

*medical* history for at least twelve months preceding the month in which the claimant filed his

application unless there is reason to believe that the development of an earlier period is necessary).

Plaintiff failed to cite any case law stating that the ALJ is required to obtain college transcripts, and

the court is aware of none.  See Pl.'s Br. at  9.  Furthermore, other evidence in the record reflects

Plaintiff's college performance.  See R. at 28, 32-3, 255-56; see also Zabala v. Astrue, 595 F.3d

402, 409 (2d Cir. 2010) (finding that remand is not warranted to consider duplicative evidence).

Therefore, the ALJ did not err in failing to obtain Plaintiff's college transcripts before rendering his

decision.

## V.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the decision of the Commissioner is **AFFIRMED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and

Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**


DATED:        September 08, 2015
              Albany, New York


Lawrence E. Kahn
U.S. District Judge